```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF GEORGIA
 2                      VALDOSTA DIVISION
                   CASE NO. 7:07-CR-00036
 3

 4

 5    UNITED STATES OF AMERICA

 6         Plaintiff,

 7    Vs.

 8    JUAN GABRIEL MALDONADO aka

 9    JUAN GABRIAL MALDONADO

10         Defendant.

11

12

13                   DETENTION HEARING
            BEFORE THE HONORABLE RICHARD L. HODGE
14          UNITED STATES DISTRICT COURT MAGISTRATE

15

16

17    DATE:                    OCTOBER 15, 2007

18    LOCATION:                ALBANY, GEORGIA

19    COURT REPORTER:          TAPE RECORDED

20

21    APPEARANCES:

22         FOR THE PLAINTIFF:  LEAH E. MCEWEN

23         FOR THE DEFENDANT:  RICKY D. COLLUM

24    ALSO PRESENT:

25         INTERPRETER:        MARCELLA MOODY
```

1

2                                I N D E X

3                               WITNESSES

4      For Government:                                    page

5      Richard E. Bell, Jr.
        Direct Examination by Ms. McEwen                  4:6
6       Cross-Examination by Mr. Collum                   10:20

7      For Defendant:                                     page

8      Maria Nunez
        Direct Examination by Mr. Collum                  23:11
9       Cross-Examination by Ms. McEwen                   26:13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              COUNSEL COLLECTIVELY:  Good morning, Your

 3    Honor.

 4              THE COURT:  Today's date, I believe, is Monday,

 5    the 15th of October 2007.  It's a few minutes after 9:30

 6    in the morning.  We have a preliminary hearing and

 7    detention hearing scheduled in case number 1:07-mj-39,

 8    which is styled United States of America versus Juan

 9    Gabriel Maldonado.  The government will be represented by

10    Ms. McEwen and the defendant is represented by Mr.

11    Collum.

12         Ms. McEwen, is the government ready to proceed?

13              MS. MCEWEN:  Yes, Your Honor.

14              THE COURT:  Mr. Collum, are you ready to

15    proceed?

16              MR. COLLUM:  Yes, Your Honor.

17              THE COURT:  Okay.  Mr. Maldonado, can you

18    understand what's going on through the interpreter?

19         (Transriber's note:  All of the defendant's answers

20    are given through the interpreter unless otherwise noted)

21              DEFENDANT MALDONADO:  Yes, Your Honor.

22              THE COURT:  Okay.  If at any time you do not

23    understand what's being said or what's happening, will

24    you let your attorney know?

25              DEFENDANT MALDONADO:  Yes.
```

1              THE COURT:  Thank you.

2         All right.  Ms. McEwen, you may proceed.

3              MS. MCEWEN:  The government will call Agent

4    Bell.

5         **RICHARD E. BELL,JR., GOVERNMENT'S WITNESS, SWORN**

6                   **DIRECT EXAMINATION**

7    **BY MS. MCEWEN:**

8    Q    Will you state your name and employment for the

9    record, please, sir?

10   A    Richard E. Bell, Jr., FBI.

11   Q    How long have you been an agent with the FBI?

12   A    Approximately 11 years.

13   Q    Where is your current assignment?

14   A    Valdosta, Georgia.

15   Q    And during the time that you've been assigned to

16   Valdosta, Georgia, have you become familiar with the

17   defendant Juan Gabriel Maldonado?

18   A    Yes.

19   Q    And how did you first become familiar with him?

20   A    Through the Colquitt County Drug Task Force.

21   Q    Did they basically ask you to conduct an

22   investigation into the activities of Mr. Maldonado?

23   A    Yes.

24   Q    And in doing so, have you been able to make buys

25   using a confidential informant or source from Mr.

1    Maldonado?

2    A    Yes.

3    Q    And what is it that you have been able to purchase

4    through this source?

5    A    Cocaine.

6    Q    Powder cocaine or crack cocaine?

7    A    Powder cocaine.

8    Q    When did the first undercover buy take place?

9    A    I believe it was February 21, 2007.

10   Q    And did it take place within the Middle District of

11   Georgia?

12   A    Yes.

13   Q    Describe for the Court the amount of cocaine that

14   was purchased on that occasion.

15   A    Approximately one kilogram.

16   Q    And has that been tested by a laboratory and

17   determined to be cocaine?

18   A    Yes.  It was recently tested by the Drug Enforcement

19   Administration, Miami, Florida.  It was determined to be

20   80 percent pure.

21   Q    And on that occasion, describe generally what took

22   place with the source and Mr. Maldonado.

23   A    The source received a call some time early that --

24   earlier that morning.  The source was solicited to

25   purchase a kilogram of cocaine for $20,000.  The call was

1    overheard by myself and another investigator.  It was

2    also recorded.  A time -- an approximate time was set up

3    later that afternoon for the source to meet with

4    Maldonado.

5         Later that afternoon, the source contacted,

6    telephonically, Maldonado.  An approximate place on

7    Crosby Road was determined as a meeting place.  The

8    source was once again provided with a recording device.

9    That telephone call was recorded.  Another recording

10   device was sent with the source, and the transaction was

11   recorded.

12   Q    Following that transaction, did the source later

13   learn that Mr. Maldonado was expecting a shipment of

14   cocaine?

15   A    Yes.

16   Q    About when did that take place?

17   A    June 2007.

18   Q    And after the source relayed that information to

19   you, what did you do?

20   A    We advised the source to let us know when the

21   shipment arrived, which he did, which was later that

22   night.  Task Force Officer Steve Exum obtained a search

23   warrant for Maldonado's residence.  The cocaine was

24   actually taken to Maldonado's brother-in-law's residence

25   which was direct -- almost directly across the street

1    from Maldonado's residence, and it was placed in the

2    chicken pen behind that residence.  So we got a search

3    warrant for his brother-in-law's residence.

4    Q    And upon executing a search warrant for the

5    brother-in-law's residence across the street from Mr.

6    Maldonado's residence, how much cocaine did you locate in

7    the chicken pen?

8    A    Approximately six kilograms.

9    Q    Did you later learn that there was additional

10   cocaine that had come in in the shipment?

11   A    Yes, we did.

12   Q    How much more?

13   A    Two other kilograms, which we obtained in a traffic

14   stop.

15   Q    And has that cocaine been tested as well?

16   A    Yes, it has.

17   Q    Did you have an occasion to interview Mr. Maldonado

18   following his arrest in June?

19   A    Yes, later that evening.

20   Q    Did you explain his Miranda rights to him?

21   A    I did.  They were read to him, and they were

22   translated to him in Spanish.

23   Q    And did he agree to speak with you after learning of

24   his rights?

25   A    Yes.

1    Q     What did he state to you in that interview?

2    A     He admitted that he had arranged for the shipment of

3    cocaine from Atlanta.  He stated that his role in the

4    shipment was to sell the cocaine while the two

5    individuals were there staying with him in his residence

6    from Atlanta.

7    Q     Since the time of his arrest and incarceration at

8    the Colquitt County Jail, have you and other agents

9    reviewed certain recorded telephone conversations in

10   which Mr. Maldonado has engaged?

11   A     Yes.

12   Q     And from those conversations, have you learned of

13   any ongoing narcotics activity involving Mr. Maldonado?

14   A     No.

15   Q     Have you learned of any plans to leave the

16   jurisdiction if released on bond?

17   A     Yes.  He stated that upon his release, which it was

18   my perception from the way he was talking on the

19   telephone recording that he felt that he was going to be

20   released fairly soon, meaning some time last week from --

21   at a bond hearing, but he stated on the -- on the

22   telephone that as soon as he got out, that he was

23   returning to Mexico.

24   Q     In addition to those ties to Mexico, have you

25   learned of any ties to any other countries that Mr.

1    Maldonado has?

2    A    Yes, Peru.

3    Q    Describe the ties that he has to Peru.

4    A    There's a female there, and it's my perception, once

5    again from the telephone call, that the lady from Peru

6    recently had a child, and (unintelligible) has something

7    to do with Maldonado.

8    Q    Do you believe he's the father of that child?

9    A    (No audible response)

10   Q    In the course of your investigation, have you

11   learned of Mr. Maldonado making trips to Mexico?

12   A    No.

13   Q    Have you learned of him making trips to the

14   Brownsville, Texas, border area?

15   A    Yes.

16   Q    Describe those trips.

17   A    I learned from a reliable source that Maldonado had

18   been to Brownsville, Texas, and at that time we believe

19   it was an effort to traffic weapons.

20   Q    Speaking of weapons, are you familiar with a brother

21   of Mr. Maldonado, Birginio Maldonado?

22   A    Yes.

23   Q    Have you reviewed a My Space web page which

24   contained a large number of weapons put up by Mr.

25   Birginio Maldonado?

1    A    Yes, weapons and cash.

2    Q    Describe the weapons that were present on that web

3    page.

4    A    One appeared to be an AK-47.  One was a six-shooter

5    tucked in his belt.  There were numerous -- numerous

6    other weapons and some other photos, but they were spread

7    out on a bed or a gun case.  They were laid out in a

8    display fashion.

9    Q    Have you spoken to Mr. Birginio Maldonado about

10   those weapons?

11   A    Yes.

12   Q    And who did he state was the owner of those weapons?

13   A    I don't recall, but he did say that he was not in

14   possession of the weapons anymore at this time.

15        MS. MCEWEN:  I don't have anything further of

16   this witness, Your Honor.

17        THE COURT:  Okay.  Mr. Collum?

18        MR. COLLUM:  Thank you, Your Honor.

19                    **CROSS EXAMINATION**

20   **BY MR. COLLUM:**

21   Q    Agent Bell, good morning.

22   A    Morning.

23   Q    You testified earlier that on February 21, 2007,

24   your confidential source met with Juan Maldonado?

25   A    After the telephone call, yes, sir.

1    Q    All right.  Now, before -- before that telephone

2    call, what did you do to corroborate your confidential

3    source's information?

4    A    I listened to the telephone call.  He was standing

5    right there.

6    Q    No, I'm talking about before the telephone call.

7    Did you do anything before that?  Your confidential

8    source came to you, correct?

9    A    Correct.

10   Q    And that confidential source told you what about Mr.

11   Maldonado?

12   A    That he was trafficking large amounts of cocaine.

13   Q    Okay.  And did you do anything before that telephone

14   call to corroborate the confidential source's

15   information?

16   A    Yes.  We also had other sources, not just this one.

17   It was corroborated through other sources.

18   Q    So how many sources told you something about Mr.

19   Maldonado before the telephone call?

20   A    Two.

21   Q    Two.  Okay.  And did you corroborate anything about

22   each one of those sources' information other than just

23   the two sources telling you the same story?

24   A    The other source had actually purchased from

25   Maldonado in the past.

1    Q    And did you witness that transaction?

2    A    It was Colquitt County Drug Task Force case at the

3    time.

4    Q    And did anyone at the Colquitt County Drug Task

5    Force witness that prior drug transaction?

6    A    I can't testify to that.  I wasn't there.

7    Q    And have you heard anything about that, about anyone

8    from the Colquitt County Drug Task Force witnessing that

9    prior drug transaction?

10   A    I'm sure that someone did, but no one has actually

11   come to me and said anything.

12   Q    Okay.  So at that point in time before the phone

13   conversation, you had not corroborated any information

14   that those two sources had provided to you?

15   A    No.  We had -- we had several other telephone calls

16   that had been recorded in addition to surveillance.  No,

17   it was just not that one telephone call.  We had numerous

18   other telephone calls --

19   Q    Okay.

20   A    -- that corroborated information up to that point.

21   Q    Okay.  Tell me about those prior telephone calls.

22   What were they?

23   A    They pretty much talked about the same -- the same

24   thing, drug transactions, when it was coming in.

25   Q    And who are the people on those phone calls?

1    A     Maldonado and my source.

2    Q     How did you identify Mr. Maldonado on those

3    telephone calls?

4    A     Well, the telephones for one, hand registers for

5    two, and I knew his voice.  I'm very familiar with it.

6    Q     Okay.  Now, were there -- were the conversations in

7    Spanish?

8    A     Yes.

9    Q     Okay.

10   A     Most of the time.  Some broken English, but yes.

11   Q     Are you fluent in Spanish?

12   A     Me?  No, sir.

13   Q     Are you able to discern people's dialects in

14   Spanish?

15   A     All of the telephone -- all of the recorded

16   telephone calls are sent to our specialist in Atlanta,

17   and they were transcribed and sent back to us in English.

18   Q     Okay.  But you, personally, you overheard these

19   telephone conversations, correct?

20   A     Correct.

21   Q     And they were in Spanish, correct?

22   A     Correct.

23   Q     Are you able to discern different dialects of the

24   Spanish-speaking people?

25   A     That's why it was sent to our specialist in Atlanta,

1    who sent it back to us in English.

2    Q    Had that specialist in Atlanta heard Mr. Maldonado's

3    voice in person?

4    A    Heard it from the tape, from the recording.

5    Q    Okay.  So the only information that that specialist

6    in Atlanta had was a tape, correct?

7    A    A recording.

8    Q    A recording.  And you had told that specialist in

9    advance that the person on the phone was Juan Maldonado?

10   A    In addition to the telephone recordings, we also had

11   face-to-face meets where we were actually able to

12   visually see Maldonado talking to the source, so it was

13   obvious that was Maldonado talking.

14   Q    So you were -- you personally observed the

15   confidential source and Maldonado speaking and also

16   simultaneously taping that conversation?

17   A    We were able to sit there and look at them talking,

18   yes.

19   Q    But -- and the conversation that you witnessed was

20   being taped?

21   A    Yes.  And we could hear it in our vehicle.

22   Q    That's what I needed to know.  All right.  Thank

23   you.

24        So you knew, you had positive identification on the

25   individuals who were being recorded?

```
 1   A    Yes, sir.

 2   Q    Okay.  That's what I needed to know.

 3   A    Sorry.

 4   Q    Now, the cocaine that was mentioned on direct, there

 5   was -- it was found at Juan Maldonado's brother-in-law's

 6   house?

 7   A    Correct.

 8   Q    So there was no cocaine found on his property

 9   whatsoever?

10   A    No.

11   Q    And there was no cocaine found on him?

12   A    No.

13   Q    There was no drug residue found on my client?

14   A    No.

15   Q    There was no drug paraphernalia found on my client?

16   A    No.

17   Q    There was no drug paraphernalia found on his

18   property?

19   A    I think there was.

20   Q    What was it?

21   A    I can't testify to that because I'd have to see the

22   property receipt.

23   Q    So you don't -- so here today you have no

24   information that you can testify to that there was drug

25   paraphernalia found on his property?
```

```
 1    A    The search warrant wasn't for his property.

 2    Q    Okay.  So the question is though, you cannot testify

 3    here today that you saw any drug -- that any drug

 4    paraphernalia was found on Juan Maldonado's property?

 5    A    No.  My source was with him when the shipment come

 6    in.  They were taking it to his residence.  At the last

 7    minute, Maldonado decided to take it to his

 8    brother-in-law's residence.

 9    Q    Okay.  But, yes or no, there were no -- there was no

10    drug paraphernalia found on my client's property to your

11    knowledge?

12    A    I didn't.  (Unintelligible)

13    Q    (Unintelligible) All right.  You were asked on

14    direct examination about telephone calls that you

15    overheard, that you listened to from the Colquitt County

16    Jail, correct?

17    A    Yes.

18    Q    And I believe one of the questions was asked about

19    whether Mr. Maldonado would leave the country.

20    A    Yes.

21    Q    Now, could you tell me again, one more time, what it

22    was that you heard on those tapes?

23    A    I don't recall who he was talking to, but he said

24    that when he got out that he was going back to Mexico.

25    Q    Now, in the context of getting out, that could have
```

1    been when all of this was resolved and he was found

2    innocent, correct?  When all of this was done?

3    A    That would be speculation on my part.

4    Q    So you don't know?

5    A    Judging from the telephone conversation that I was

6    listening to or reading from the translation, it was my

7    perception that he believed he was going to bond out last

8    week, and as soon as he got out, he was going back to

9    Mexico.

10   Q    But you don't know for a fact that he was going to

11   go back to Mexico after he bonded out?

12   A    I do not know for a fact.

13   Q    Okay.  Now, also, were those taped conversations in

14   Spanish as well?

15   A    Yes.

16   Q    Who translated those conversations for you?

17   A    We have a unit in Atlanta that does that.

18   Q    And how did you know that that was Juan Maldonado on

19   the phone making those conversations?

20   A    When they do the tape recordings at the Jail,

21   they're identified.  I can't testify much more to that

22   because I don't work at the jail, but they're identified

23   I believe by name, calling card number, some identifier,

24   and that's the way the tape is marked.

25   Q    Okay.  But you don't know -- do you know that for a

 1    fact that's how it's done?

 2    A    No.   That's what I was told, but I don't know it to

 3    be a fact.

 4    Q    So you really don't know how that individual is

 5    identified as Juan Maldonado, do you?

 6    A    That's what I was told, it was by an inmate number

 7    or some identifying means.

 8    Q    And you don't know whether it was possible that some

 9    other inmate could have used his identifier?

10    A    That's always possible.

11    Q    So you don't -- and you did not witness him making

12    those con -- those phone calls, did you?

13    A    No.

14    Q    So you don't know for a fact to testify here today

15    that that was Juan Maldonado making that telephone call?

16    A    Not for a fact.

17    Q    Okay.   All right.   Now, also there was some

18    conversation on direct about weapons on a My Space page.

19    Who was that individual holding the weapons?

20    A    Birginio Maldonado.

21    Q    And who is that?

22    A    It's his brother.

23    Q    But as far as you know, my client wasn't on any web

24    space page showing off any weapons, was he?

25    A    Not to my knowledge.

1   Q    And did you do an investigation at all on how Juan

2   Maldonado works as far as a day job or anything like

3   that?

4   A    As far as I can determine, he hasn't worked in quite

5   some time.

6   Q    You didn't go talk to any of the farmers that he

7   works for?

8   A    No.  That would be (unintelligible) my

9   investigation.  I couldn't do that, but I've talked to

10  other sources and other investigators, and through

11  surveillance, we haven't seen him work in quite some

12  time.

13  Q    And when you say "we", you're -- you're talking

14  about who?

15  A    My task force, the Southwest Georgia Gang Task

16  Force.

17  Q    Okay.  And is one of those individuals Mr. Steve

18  Exum?

19  A    Yes.

20  Q    Okay.  And did he -- Well, I don't want to ask you

21  what he did.  I can talk to him about that later.

22       Now, I've got a question for you, Mr. Bell, about

23  this June 18th interview that you did with Mr. Maldonado.

24  I was looking at your affidavit, and you state in here

25  that Maldonado admitted that he had arranged for Adrian

```
 1    Perez Negron and Joaquin Robles --
 2            How do you say that?
 3    A     It's close.
 4    Q     Close.
 5            -- to drive from Atlanta, Georgia, and deliver the
 6    cocaine?
 7    A     Yes.
 8    Q     Okay.  Tell us about that interview.  Who was there?
 9    Who was present?
10    A     Myself and an interpreter.
11    Q     And Mr. Maldonado?
12    A     Right.
13    Q     Just the three of you?
14    A     Yes.
15    Q     Where is that interpreter now?
16    A     Colquitt County, I assume.
17    Q     What's that person's name?
18    A     I don't recall right now.
19    Q     You can't remember the name of the interpreter?
20    A     No, sir.
21    Q     And you don't speak Spanish, correct?
22    A     No.
23    Q     And that court reporter -- I mean -- excuse me --
24    that interpreter is not a federal court-appointed
25    interpreter?
```

```
 1    A    I don't know.

 2    Q    And the person who's not hired by the FBI, are they?

 3    A    No.

 4    Q    Who employs that interpreter?

 5    A    To my knowledge, Colquitt County Sheriff's Office.

 6    Q    That interpreter isn't here today?

 7    A    No.

 8    Q    So you don't know for a fact whether the information

 9    that interpreter gave you was correct or not, do you?

10    A    I believe it is.

11    Q    You believe it is, but you don't speak Spanish, do

12    you?

13    A    No.

14    Q    So you don't really know whether what that

15    interpreter told you was what Mr. Maldonado said?

16    A    I believe it is.

17    Q    But what I'm saying is you don't know that what that

18    interpreter told you is what Mr. Maldonado said?

19    A    Technically, no.

20              MR. COLLUM:  No further questions, Your Honor.

21              MS. MCEWEN:  No redirect, Your Honor.

22              THE COURT:  You can step down.  Thank you.

23              MS. MCEWEN:  The government rests, Your Honor.

24              THE COURT:  Mr. Collum, the government has

25    rested.
```

1            MR. COLLUM:  Your Honor, do you want us to put

2    up a witness as to the detention hearing?  We have no

3    witnesses as far as the preliminary examination is

4    concerned.  Would you like for us to conclude with that

5    before we go into the detention hearing?

6            THE COURT:  Well, I guess however you want to

7    do it.  It doesn't matter to me.  I can tell you that I

8    believe the interpreter.  I find there's adequate

9    probable cause which does give rise to the presumption.

10   Now, if you have witnesses that you want me to hear with

11   regard to release or detention, certainly I'm going to

12   allow you to put up your witnesses.

13           MR. COLLUM:  We have one, Your Honor.

14           THE COURT:  Certainly.

15           MR. COLLUM:  Ms. Maria Nunez.

16       Your Honor, she does not speak English.  I've spoken

17   with Marcella, and she would be willing to interpret for

18   her.

19           THE COURT:  She's going to have to interpret

20   for me and then run tell him?

21           MR. COLLUM:  Well --

22           THE COURT:  How are we going to do this?

23           MR. COLLUM:  -- I have another -- I have

24   another individual, Your Honor, who can interpret for

25   (unintelligible).

```
 1              THE COURT:  Can you use a microphone somewhere
 2    and interpret the responses?  I'm assuming that Mr.
 3    Maldonado will be able to understand this witness'
 4    responses.
 5         You can go ahead and swear her, please.
 6         (Witness sworn)
 7         (Discussion about microphones)
 8              THE COURT:  We'll try it this way and see if
 9    it'll work.  If not, we'll figure out what Plan B is.
10              MARIA NUNEZ, DEFENDANT'S WITNESS, SWORN
11                    DIRECT EXAMINATION
12    BY MR. COLLUM:
13    Q    Ms. Nunez?
14    A    Si.
15    Q    Please state your name for the record.
16    A    Maria --
17              THE COURT:  Whoa.  Whoa.  Whoa.  You need to
18    translate it into English so I can understand --
19              INTERPRETER:  Okay.
20              THE COURT:  -- what she's saying.
21         I assume -- Ask Mr. Maldonado if he can understand
22    her without an interpreter.
23              INTERPRETER:  Okay.
24              THE COURT:  Tell him, please, if he doesn't
25    understand to let his lawyer know.
```

1          Okay.  Now, you've got to translate for myself and

2     Ms. McEwen.

3               INTERPRETER:  Okay.

4               THE COURT:  And Mr. Collum, I suppose.

5          Okay.  So now we'll start over.

6               MR. COLLUM:  Thank you, Your Honor.

7          (All of the answers are given through the

8     interpreter unless otherwise noted)

9     BY MR. COLLUM, CONTINUED:

10    Q    Ms. Nunez, please state your name for the record.

11    A    Maria Nunez.

12              INTERPRETER:  Her name is Maria Nunez.

13    Q    Ms. Nunez, how do you know Juan Maldonado?

14    A    He's a good son.

15              THE COURT:  He's what?

16              INTERPRETER:  A good son.

17    Q    If Mr. Juan Maldonado is released on bond, will he

18    be able to stay with you?

19    A    She said she will accept him staying with him [sic].

20    He's always stayed with him all his life, so she has no

21    problem with that.

22    Q    Would you be willing to have --

23              INTERPRETER:  Say that again.

24    Q    Would you be willing to have him wear an ankle

25    monitor?

```
 1    A      She said -- he said -- she said that she doesn't
 2    know much about that, but she will accept whatever it is,
 3    and she's home all the time.  She stays home, and she
 4    stays home with her grandkids.
 5    Q      Now, since you stay home all the time --
 6    A      She does not work.
 7    Q      -- you would be able to watch Juan Maldonado?
 8    A      She said she -- she said she accepts anything and
 9    her son is good.
10    Q      So you would be able to keep an eye on him?
11    A      She said yes.
12    Q      Also, Ms. Nunez, would you be willing to put up any
13    property to secure a bond for your son?
14    A      She said she doesn't know how much they will want
15    for -- as far as land.
16           Because she's also paying for her land, but also the
17    children -- her children can also help pay for any.
18    Q      Also how long have you lived in the United States?
19    A      She has been here for 21 years.
20    Q      How long has Juan Maldonado lived in the United
21    States?
22    A      She brought him here when he was 13.
23    Q      Has he ever --
24           THE COURT:  How old is he now?
25           THE WITNESS:  34.  He's 34 years old.
```

1    Q    Has Juan Maldonado lived anywhere else in the last

2    21 years other than Moultrie, Georgia?

3    A    She said she brought him here when he was little,

4    here to Georgia.

5    Q    Ms. Maldonado, what does your son do for a living?

6    How does he make his living working?

7    A    He works in the fields.

8    Q    And how long has he done that?

9    A    He started working when -- around when he was 17 or

10   18 years old.

11           MR. COLLUM:  No further questions, Your Honor.

12                    <u>**CROSS EXAMINATION**</u>

13   **BY MS. MCEWEN:**

14   Q    Ms. Nunez, are you a citizen of the United States?

15   A    She said permanent resident.

16   Q    Is your son also a permanent resident?

17   A    Yes.

18   Q    Prior to his being arrested several months ago, how

19   much contact did you have with your son?

20   A    Every day.

21   Q    Where was he living?

22   A    Okay.  When he -- he has his own house, but he

23   divorce about three years ago, and he would come and go

24   to the house, to his -- her house, and he would go to the

25   house back and forth.

1    Q     Where is his house located?

2    A     Close to hers.  Less than a mile.

3    Q     Where does he work?  When you say "in the fields",

4    where are those fields?

5    A     The count -- the fields are a little far, but they

6    are in the fields, and she knows that he works in the

7    fields.

8    Q     When you say "a little far", how long is he gone on

9    a daily basis?

10   A     Okay.  When he goes he oftentimes comes to her house

11   to have lunch and then he goes back to work.  Sometimes

12   he'll take a lunch and he won't come that day to eat

13   lunch with her.

14   Q     What time does he leave in the morning?

15   A     Sometimes at 8 and sometimes at 7.

16   Q     What does he return home in the evening?

17   A     He said depends, sometimes they can get off early,

18   sometimes it's later in the afternoon.

19   Q     Just an estimate of the time, please.

20   A     She said that they really don't have a time.

21   Sometimes they might work five to six hours in a day and

22   sometimes he might work ten hours that day.

23   Q     How much does your son make working in the fields?

24   A     He's a contractor.  He actually hires the people to

25   take out to the field.

1    Q    How much does he make?

2    A    He say sometimes it is not something that is --

3    because it's by contract, sometimes it's good money, and

4    sometimes it's not so good.  He say it just depends on

5    the hours that he works.

6    Q    What is good money?

7    A    Sometimes 3500, sometimes a 1000, sometimes less.

8    Q    Per week, per month?

9    A    By week.

10   Q    Does he share this money for the income of your

11   household?

12   A    He said he gives her money because he cohabitates

13   with them.

14   Q    How much?

15   A    He says well, it depends.  If he makes good money,

16   he gives them some.  If he doesn't make a lot, then, you

17   know, she gives him a little bit.  It just depends.

18   Q    Ms. Nunez, do you get money from your other

19   children?

20   A    She said that other children don't really help her

21   out that much.  Usually sometimes only like during

22   Mother's Day or something like that because they're the

23   ones don't really have good jobs.

24   Q    How much is your household bills or budget for a

25   month?

1    A    She said she -- she's paying for her house so she

2    pays $530 a month in her house, for the note of her

3    house.

4    Q    What about other bills?

5    A    And the phone, insurance.  She says payments that

6    she has.

7    Q    Where do you get your other money?

8    A    Her husband works also.  His father.

9    Q    What does he do?

10   A    He also -- they also contract work like her son.

11   Q    How much does he make?

12   A    Since it's seasonal work, it depends on the season.

13   Some seasons are good and some seasons is not as good.

14   Q    Where are the fields where her husband works?

15   A    She said that -- he says that he -- it's a little

16   far from his house, but his husband usually wakes up

17   around 6:00 and to go wake up all the people that they

18   are going to pick up for the field.

19   Q    Have you ever been to visit either your husband or

20   your son in any of the fields where they work?

21   A    She said she does go sometimes.  Sometimes, because

22   she does take care of five grandchildren.

23   Q    Where were the fields when you went to visit them?

24   A    The work in the Garcia's field.  She says she's not

25   sure exactly where is -- exactly their location, but --

1    she said they sent him to this area, and then they send

2    them to this area.

3    Q    All within Colquitt County or --

4    A    She said only in Moultrie.

5    Q    Have there been days where your son did not come to

6    visit you?

7    A    He's in the house every day.  Yeah.

8              INTERPRETER:  Can I re --

9              MS. MCEWEN:  Sure.

10   A    She says she feeds him every day.  So he's in her

11   house every day.

12   Q    Has he been to visit his children in Texas?

13   A    She said that she's aware she has not gone to see

14   his kids in Texas.

15   Q    Does he send money to his children in Texas?

16   A    He said when he's, you know, working and making

17   money, he does send his children money.

18   Q    Have you ever seen her son in possession of any

19   weapons, guns?

20   A    He says sometimes, but he doesn't do anything bad

21   with these weapons.  He stay in the house, but he doesn't

22   do any bad things with them.

23   Q    How many guns?

24   A    Right now he doesn't have any because they don't

25   have any in the house.  And then she said really

1    (unintelligible)

2         She doesn't remember what she was going to say.

3    Q    When was the last time you saw him with a gun?

4    A    She said it's been a while.  He said he doesn't do

5    any bad things with it, but it's been a while.

6    Q    What happened to the guns?

7    A    The government took them.

8    Q    Where did he get them from?

9    A    They bought -- they buy them.  And she doesn't know

10   where, but like gun stores or something like that.

11   Q    Before the government took the guns, how many were

12   there?

13   A    She said she's not -- she doesn't know.  He does not

14   own them.

15   Q    How many other children does she have?

16   A    She said there's ten children, boys and girls.

17   Q    Do they all live in Moultrie?

18   A    They all live in Moultrie.

19   Q    Who is Geronimo Garcia?

20   A    He is a brother-in-law.

21   Q    Why would he have several kilograms of cocaine in a

22   chicken pen behind his house?

23        MR. COLLUM:  Your Honor, she can't test --

24   Objection.  She can't testify to that.  The cross

25   examination is going outside the scope of the detention

1    hearing, and also she cannot testify, Your Honor, to what

2    someone else -- why he has whatever he has in his

3    possession.

4              MS. MCEWEN:  We don't know, Your Honor.  She

5    may have knowledge of Mr. Garcia's selling narcotics and

6    why he would have that behind his house.

7              MR. COLLUM:  She does not have personal

8    knowledge of why he --

9              THE COURT:  You don't know that.  Let her

10   answer it.  I mean she may say has no knowledge, but you

11   can't really speculate as to what she knows, Mr. Collum.

12   She may have a completely probable explanation for the

13   question.

14   BY MS. MCEWEN, CONTINUED:

15   Q    Why does he have several kilograms of cocaine in a

16   chicken pen?

17   A    Senora, he said who?

18   Q    Geronimo Garcia.

19   A    She didn't know that.

20             THE COURT:  Okay.  So she doesn't know, so we

21   need -- we can abandon that.

22             MS. MCEWEN:  Yes, Your Honor.  I have nothing

23   further.

24             THE COURT:  Mr. Collum, any redirect?

25             MR. COLLUM:  No, Your Honor.

 1              THE COURT:  Okay.  Ma'am, you can tell her --
 2      She's figured it out.
 3          Other evidence for the defendant, Mr. Collum?
 4              MR. COLLUM:  No, Your Honor.
 5              THE COURT:  Anything in rebuttal?
 6              MS. MCEWEN:  No, Your Honor.
 7              THE COURT:  Okay.  Argument?
 8              MS. MCEWEN:  Just briefly, Your Honor.
 9          The agent has testified that he has overheard --
10              THE COURT:  Pardon me.  Mr. Collum, I assume
11      you're waiving opening and reserving concluding?
12              MR. COLLUM:  Yes, Your Honor.
13              THE COURT:  Okay.  I'm sorry.  Go ahead, Ms.
14      McEwen.
15              MS. MCEWEN:  The agent has testified that he
16      has overheard Mr. Maldonado in phone conversations from
17      the jail say that when he's released, that he would
18      return to Mexico.  Additionally he has overheard
19      conversations which lead him to believe that Mr.
20      Maldonado has been engaged in a romantic relationship
21      with an individual in Peru.  And I would state that these
22      things, along with the fact that he's not a citizen but
23      merely a permanent resident of this country, would lead
24      the Court to believe that he is a flight risk.
25          And with those indicia of flight along with Mr.

1    Maldonado's history of trafficking cocaine in this

2    particular case having gone on for several months, I

3    would suggest that the presumption has not been rebutted

4    here today, and ask the Court to detain him.

5              THE COURT:  Mr. Collum.

6              MR. COLLUM:  Yes, Your Honor.

7         Mister -- Agent Bell did overhear some conversation,

8    but it was in Spanish, and he's admitted under oath that

9    he doesn't understand Spanish, and he had to have it sent

10   to Atlanta to be transcribed.  He admitted under oath,

11   Your Honor, that he does not know for a fact that Mr.

12   Maldonado was the individual making that phone call.  We

13   have no info -- we have no one from the Colquitt County

14   Jail telling us how those phone calls are monitored.

15        So, Your Honor, we really don't know for a fact here

16   today that Mr. Maldonado made any of those phone calls or

17   said that he was going to go back to Mexico.  And if he

18   did make those phone calls, we don't know whether he

19   meant after the case was over and he was free and clear

20   of the allegations made.

21        Your Honor, also Mr. Maldonado has lived in

22   Moultrie, Georgia, for at least the last 21 years.

23   There's been testimony that he works for the local

24   farmers.  He has constant contact with his parents every

25   day.  His mother has testified that she's at home.  She

1    can watch Mr. Maldonado if he's released and lives with

2    her, constant supervision.  And also she is not opposed

3    to him wearing an ankle monitor if that's what it takes.

4         And also whatever property needs to be left with the

5    Court in order to secure bond, her family will be able to

6    come up with that.

7         Your Honor, there are circumstances by which this

8    Court can issue a bond in this case.  Now if that bond be

9    at a certain level, $50,000; $40,000; whatever it may be,

10   that's upon the defendant to come up with the ten percent

11   or whatever the Court deems necessary.

12        But, Your Honor, there is evidence in the record

13   that there are conditions upon which this Court can set

14   and Mr. Maldonado can be released on bond.

15        And, Your Honor, as far as all of these

16   conversations that have been taped, this interview in the

17   Colquitt County Jail, we have yet to hear from the

18   individuals who actually interpreted those conversations.

19   And, Your Honor, it could very well be that somewhere

20   something was lost in translation to where what was

21   actually written down or perceived to be one thing was

22   not what was stated.  The Court needs to hear from those

23   translators, the individuals who actually heard the

24   information.

25        Nothing further, Your Honor.

 1          THE COURT:  Okay.  Y'all give me a couple -- a

 2     few minutes, and let me look over everything, mull over

 3     this, and I shall return, like General MacArthur.

 4          (Recess)

 5          THE COURT:  I'll now announce my ruling in this

 6     matter.  I think I earlier established that or earlier

 7     stated that probable cause in this case has been clearly

 8     established, which does give rise to the rebuttable

 9     presumption in favor of detention.

10          As far as the evidence is concerned, I find the

11     weight of evidence against this defendant to be quite

12     strong and it's uncontroverted.

13          And, Mr. Collum, some of the arguments you made are

14     well taken insofar as the guilt/innocence phase of these

15     proceedings are concerned.  However, the -- as you know

16     and Ms. McEwen knows, the rules regarding admissibility

17     of evidence do not apply at a detention hearing.  I can

18     consider just about anything.

19          There's no reason for me to assume that somebody

20     identified themselves -- somebody other than the

21     defendant identified themselves as Mr. Maldonado from the

22     Colquitt County Jail in some grand conspiracy to frame

23     him.  Just as there's no reason for the purposes of the

24     detention hearing for me to assume that the interpreter

25     intentionally misstated something to the agent, again, as

1       part of a grand scheme to, you know, get your client.

2             Based on the evidence that I've seen here today, I

3       don't think there are conditions that I can impose to

4       keep him from being a danger to the community.  Obviously

5       if the FBI was called in by the local authorities, I

6       think the kilogram that we -- that we've heard about

7       being sold in February wasn't the first one.  I've heard

8       about a total of nine grams of -- nine kilograms of

9       cocaine, one sold to the confidential informant, six

10      taken from the chicken coop, and I'm almost positive I

11      heard the FBI say that the confidential source was with

12      your client when he took possession or delivery of the

13      six kilograms.

14            Am I right on that?

15            (No audible response)

16            THE COURT:  Okay.

17            Which may explain how it got into the chicken coop.

18            And then I heard about two more grams -- two more

19      kilograms taken in some sort of a traffic stop.  I don't

20      know that that's really been connected to Mr. Maldonado,

21      but seven is between 15 and 20 pounds of coke.

22            So I do find that his release would pose a danger to

23      the community.

24            Of course, he does have strong ties to those

25      Colquitt County community.  His mother and family and

1    obviously some of his children live here.  But when he

2    tells someone in a phone conversation, "When I get out,"

3    or when he gets released.  I don't think he said, "When

4    this matter's over."  Could have meant that, but "When I

5    get out, I'm going to Mexico.  "

6         And then there's some testimony about some -- some

7    connection with a woman in Peru who recently gave birth

8    to a child I think, but I'm assuming the inference I'm

9    supposed to draw is that he is the father of that child.

10   I don't know.

11        Given the fact that he is not a United States

12   citizen and has made the statement that he is going to

13   Mexico, if I were to order his release, this is certainly

14   one that Ms. McEwen would love to appeal me on, but

15   that's not why I'm ordering the detention of the

16   defendant.  I think that my job requires it, given the

17   evidence that I have heard.

18        And, of course, you're aware of your rights to

19   appeal my ruling today.

20        But I will be entering an order requiring the

21   continued detention of the defendant.

22        Now that that is done, while Mr. Maldonado is

23   present with counsel, do y'all wish to arraign him at

24   this time?  We didn't --

25        He hasn't been indicted.  We tried to do that the

 1   other day, didn't we?

 2           MR. COLLUM:  Usually the government is really

 3   quick on that.

 4           THE COURT:  Right.

 5           MR. COLLUM:  Your Honor, I do have a question

 6   though.  It's a bookkeeping matter actually.

 7       I tried to file an entry of appearance on Pacer, and

 8   because the case is sealed, it won't let me do it, and I

 9   can't receive any notices from the Court until I file an

10   entry of appearance.  So I'm kind of caught.  How do

11   y'all want me to handle that?

12           THE COURT:  That's like Catch-22.

13           MR. COLLUM:  Yes, times two.

14           MS. MCEWEN:  We'll bring up an order to

15   formally unseal it and file the redacted complaint as it

16   (unintelligible).

17           THE COURT:  Okay.  Now you've already provided

18   him with a redacted complaint, right?  We looked at -- I

19   looked at it last week.

20       Okay.  I think we probably do need to unseal it

21   since Mr. -- so Mr. Collum can represent him.

22       And you were retained in this matter; is that

23   correct, Mr. Collum?

24           MR. COLLUM:  That's correct, Your Honor.

25           THE COURT:  All right.  I will be entering a

1    written order of detention later today, and I suppose

2    this will conclude Mr. Maldonado's business before the

3    Court.

4         (After a brief discussion regarding an unrelated

5    matter, the hearing continued as follows:)

6              THE COURT:  Mr. Maldonado will remain in the

7    custody of the United States Marshals until further order

8    of the Court.  I wish I could see it some other way, but,

9    under these circumstances, I just don't think I can.

10        That's the ruling of the Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE

3

4      I HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE

5      AND CORRECT TRANSCRIPT OF THE TAPE RECORDED PROCEEDINGS.

6

7

8

9              /S_____

10                      R. DARLENE PINO

11            UNITED STATES COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25